IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JAMES E. ADAMS                                                        PLAINTIFF

v.                        Civil No. 09-3011

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                        DEFENDANT

## MEMORANDUM OPINION

Plaintiff, James Adams, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.      Procedural Background

The plaintiff filed his applications for DIB and SSI on November 25, 2005, alleging an amended onset date of March 18, 2003, due to back problems, ulcers; problems with his right ankle; a hiatal hernia, knee, neck, and left shoulder pain; heartburn; fatigue; and, problems with memory, concentration, completing tasks, and following written instructions. (Tr. 57-58, 74, 81, 83, 86, 347-348).  After the initial evaluation, plaintiff was determined to be under a disability beginning March 1, 2006.  (Tr. 12).  Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).  An administrative hearing was held on September 28, 2007.  (Tr. 342-379).  Plaintiff was present and represented by counsel.

At this time, plaintiff was 54 years of age and possessed the equivalent of a high school education.  (Tr. 58-59, 62, 64-71, 344).  He had past relevant work ("PRW") experience as a custodian/janitor.  (Tr. 57-64, 209-211, 347).

On February 29, 2008, the ALJ found that plaintiff's degenerative disk disease of the lumbar spine, dysthymia, and personality disorder not otherwise specified were severe but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 14-15).  After partially discrediting plaintiff's subjective complaints, the ALJ determined that between March 18, 2003, and February 28, 2006, plaintiff retained the residual functional capacity to perform light work involving only occasional stooping and crouching; interpersonal contact that is incidental to the work performed, the complexity of the tasks is learned and performed by rote, requires little judgment; and, simple, direct, and concrete supervision.  (Tr. 16).  With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a production work bench assembler.  (Tr. 25).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on December 8, 2008.  (Tr. 3-5).  Subsequently, plaintiff filed this action.  (Doc. # 1). This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 11, 12).

## II.  **Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be

2

affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

### A.    The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal

3

an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.   Evidence Presented

We begin by noting that the relevant time period in this case is March 18, 2003, plaintiff's alleged onset date, through February 28, 2006, the day before the Administration determined plaintiff's disability began.  It has been determined that plaintiff was disabled as of March 1, 2006.

Plaintiff contends that he had suffered from lower back pain since childhood.  (Tr. 154). In January 2006, he reported to Dr. Abraham that he had fallen out of a tree, as a child, and injured his back.  Although his parents took him for immediate treatment, plaintiff admitted that he had not complained of regular back pain to his treating doctor.  (Tr. 154).

Medical records dating back to 1993 indicate that plaintiff was seeking disability due to back pain, ulcers, and a hiatal hernia.  (Tr. 231).  He had just been for an evaluation with Dr. Abraham and wanted his own doctor to evaluate him.  The doctor's records indicate x-rays of plaintiff's back were negative, an EKG was normal, and blood work results were still unavailable.  A physical examination revealed epigastric tenderness, but no other abnormalities. Plaintiff was diagnosed with depression, dependent traits, malingering (suspect doesn't want to work), GERD, and tobacco abuse.  The doctor recommended that plaintiff stop smoking and

4

stated that he would review Dr. Abraham's report and let him know if he had anything to add to it. (Tr. 231).

In 1999, plaintiff was diagnosed with COPD. (Tr. 227-228, 248-250). The records are somewhat conflicting in that x-rays revealed significant COPD, but pulmonary function studies showed only mild COPD. (Tr. 248, 249). It was also noted that plaintiff was a smoker and needed to stop smoking. (Tr. 249, 250).

In 2001, plaintiff presented at Dr. Lance Lincoln's office for a DHS physical. (Tr. 226). Records indicate that this was a well exam and plaintiff was advised to stop smoking. He requested and was prescribed Zyban. (Tr. 226).

On August 5, 2003, plaintiff saw Dr. Lance Lincoln. (Tr. 225). He reported a history of asthma, kidney infections, nervous stomach, gastrointestinal ulcer, head or spinal injuries, and a prior nervous breakdown. However, aside from poor dentition, Dr. Lincoln noted no abnormalities. He diagnosed plaintiff with COPD, irritable bowel syndrome, chronic anxiety, and tobacco abuse. On the line labeled plan, Dr. Lincoln wrote "physically ok for DHS." (Tr. 225).

On July 18, 2004, plaintiff complained of difficulty urinating, right flank pain, and nausea. (Tr. 268-274). A pyelogram was essentially unremarkable. There was a mild degree of constipation and a small amount of residual urine in his bladder post-void. Plaintiff was diagnosed with a right kidney stone, passed, and a urinary tract infection. The doctor then released him home with prescriptions for Levaquin and Toradol. He was told to call the Friends Funds for help with his medications. (Tr. 268-274).

AO72A
(Rev. 8/82)

On December 15, 2005, plaintiff complained of severe heartburn and worsening back pain. (Tr. 142, 213). Dr. Paul Wilbur noted a decreased range of motion in plaintiff's back. He diagnosed plaintiff with abdominal tenderness, chronic back pain, and gastroesophageal reflux disease. A complete blood count was also positive for H. Pylori. Dr. Wilbur prescribed Nexium and Tylenol and asked plaintiff to follow-up in two weeks. (Tr. 142).

On December 20, 2005, plaintiff returned for a follow-up concerning his peptic ulcer disease. (Tr. 141, 212). He was quite tender in the epigastric area and had a history of vomiting some blood. Dr. Wilbur prescribed a fourteen day course of Prevpac. (Tr. 141).

On January 5, 2006, plaintiff was evaluated by Dr. Vann Smith. (Tr. 145-148). Plaintiff presented with a history of steadily worsening neurocognitive and emotive symptoms including impaired recall memory, impaired concentration, bradyphrenia, dysexecutivism, impaired attention to sequential detail, affective lability, impulse dyscontrol, recurrent "deja vu" episodes, and sleep pattern disturbance. He indicated that he was in the Army from 1968-1972, but was dishonorably discharged for "attempting to kill a Captain." Plaintiff also reported poor physical health, giving a history of degenerative disk disease ("DDD"), degenerative joint disease ("DJD"), hiatal hernia, chronic airway disease, gastric ulcer disease, chronic renal problems, and multiple closed head injuries (falls, fights, and automobile accidents) resulting in Grade II and III concussions. A neurocognitive examination revealed a cooperative male appearing his stated age with intact judgment and insight, a muted affect, fluent and informative narratives, no evidence of hallucinations or delusions, no clear suicidal or homicidal ideation or plan, a slow and hesitant gait, a guarded posture, appropriate eye contact, and functional to concrete thought processes. Dr. Smith diagnosed plaintiff with cognitive dysfunction, PTSD, coronary artery

AO72A
(Rev. 8/82)

disease, DDD, DJD, hiatal hernia, gastric ulcer disease, traumatic brain injury, and chronic pain syndrome. He stated that plaintiff manifested moderate to severe cognitive symptoms that were chronic and slowly progressive. Dr. Smith then assessed plaintiff with a GAF of 45, stating that his highest prior GAF was 75. (Tr. 145-148).

This same date, Dr. Smith completed a mental RFC assessment. (Tr. 149-153). He again diagnosed plaintiff with the same impairments and assessed him with the same GAF. Dr. Smith indicated that plaintiff's prognosis was fair. He also concluded that plaintiff would be unable to meet competitive standards with regard to maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and, dealing with the stress of semiskilled and skilled work. He also stated that plaintiff was seriously limited, but not precluded from working in coordination with or proximity to others without being unduly distracted; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; being aware of normal hazards and taking appropriate precautions; interacting appropriately with the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and, using public transportation. Dr. Smith found that plaintiff's psychiatric condition exacerbated his experience of pain or other physical symptoms

AO72A
(Rev. 8/82)

and that his impairment would cause him to miss more than four days of work per month.  (Tr. 149-153).

On January 25, 2006, plaintiff underwent a general physical examination with Dr. K. Simon Abraham.  (Tr. 154-161).  Plaintiff complained of pain in his back from his neck to his tail bone, stating that he had been experiencing this pain since falling from a tree at age nine and injuring his back.  He also reported problems with peptic ulcer disease, a hiatal hernia, and pain in his ankles.  A physical examination noted a full range of motion in all areas, no evidence of muscle spasm, no joint abnormalities or deformities, and no muscle weakness or atrophy.  He could hold a pen and write, touch fingertips to palm, grip, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk heel and toes, and squat and arise from a squatting position.  X-rays of his right ankle were normal, showing no evidence of a fracture, dislocation, or arthritis.  X-rays of his lumbar spine showed mild osteoarthritis of the lumbar spine with scalloping of the end plate at the L5 level and facet joint arthritis at the L5-S1 level.  Dr. Abraham diagnosed plaintiff with back pain, a hiatal hernia, ankle stiffness, and questionable emphysema.  He concluded that plaintiff had no limitations.  (Tr. 154-161).

On March 7, 2006, plaintiff underwent a mental status and evaluation of adaptive functioning evaluation with Dr. Adam Brazas.  (Tr. 162-170).  Plaintiff presented wearing blue jeans, cowboy boots, a western shirt, and a jacket.  He had good grooming and hygiene.  Plaintiff reported problems with his back, ulcers, a hiatal hernia, a messed up neck, a bad right ankle, arthritis in his knees, numbness in his right arm, problems with his left shoulder, asthma, and sinus problems.  When probed, he also described difficulty sleeping, a history of anger problems, forgetfulness, premonition, depression, and stress.  Plaintiff mentioned that he had experienced

8

a nervous breakdown in 1968.  However, he never received any inpatient psychiatric treatment.

Plaintiff detailed outpatient treatment in the early 1990s, while he was going through a divorce.

At that time, he was placed on antidepressants.  He also reported some outpatient treatment in

the 1970s following a suicide attempt.  Further, plaintiff experienced some anger problems  in

the 1970s while in the Army, stating that he was discharged because he was going to put a tent

peg through the heart of another soldier who had been harassing him.  The psychiatrist reportedly

wrote "crazy" on his chart.  (Tr. 162-170).

Plaintiff was friendly, cooperative, and pleasant, and appeared relaxed during the

evaluation.  (Tr. 162-170).  He made good eye contact and spontaneously elaborated on questions

or queries from the examiner.  Plaintiff's speech was normal in rate, tone, volume, and prosody

and the content of his speech was lucid, rational, and adequately organized.  He denied

hallucinations and there was no evidence of delusions or paranoid thoughts.  As for unusual

powers, plaintiff reported experiencing a premonition that he was going to go bankrupt and went

bankrupt the following year.  His affect was within normal limits and there was no indication of

any depression or anxiety in his affect or demeanor.  However, plaintiff reported experiencing

depression since his nervous breakdown in 1968, but denied suicidal or homicidal ideations.

Although plaintiff complained of poor energy levels, Dr. Brazas noted that his energy level

appeared normal during the session.  (Tr. 162-170).

Plaintiff disclosed no social life, aside from his relationship with his roommates.  (Tr.

162-170).  He described staying to himself a lot, specifically staying in his room. Plaintiff

reported that he performed chores around the house and occasionally received cigarette money

for doing so.  If he had no money, plaintiff admitted picking up cigarette butts to smoke.

9

Plaintiff stated that he was able to care for his own personal hygiene and cooperate with medical advice, but needed special supervision.  He was also able to drive in familiar and unfamiliar places and to drive alone.  Further, plaintiff stated that he could shop for groceries, clothing, and personal items; use a checkbook; and, make change.  (Tr. 162-170).

Dr. Brazas diagnosed plaintiff with dysthymic disorder and personality disorder not otherwise specified.  (Tr. 162-170).  He assessed plaintiff with a GAF of 60 and found no obvious indication of organicity.  Based on his numerous physical problems, as well as depression, Dr. Brazas concluded that plaintiff's condition was not likely to see significant improvement over the next twelve months.  He also determined that plaintiff's prognosis was guarded.  Dr. Brazas stated that plaintiff performed adequately on the mental status exam, except that he was very suspicious about plaintiff's relatively poor performance on the digits forward and backward.  However, he persisted throughout the evaluation and worked at a normal pace. Dr. Brazas also stated that it appeared plaintiff was trying too hard to make a case for disability without offering numerous physical complaints.  His depression did not seem to be severe to the degree of limiting his ability to be gainfully employed.  (Tr. 162-170).

## IV.   Discussion

Plaintiff contends that the ALJ's decision denying benefits is not supported by substantial evidence because the ALJ failed to make full and explicit findings explaining his disregard of the medical records; cited plaintiff's history of illicit drug use and faulted physicians for not considering without referencing any portion of the record lending support for the notion that plaintiff continued to abuse drugs and alcohol; overlooked the findings of Dr. Safwan Sakr , a rheumatologist, who found diagnosed plaintiff with fibromyalgia; and, failed to afford Dr. Vann

10

Smith's opinion the proper weight. We will review the ALJ's assessment of plaintiff's subjective complaints, his RFC assessment, and the vocational expert's testimony in considering the issues plaintiff has raised.

### A.    Subjective Complaints

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so,

11

the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

Although plaintiff alleges disability due to mental impairments and back pain beginning March 18, 2003, we can not say that the overall record supports his claims. We note plaintiff's claim that he injured his back as a child and had lived with chronic pain since that time. However, the record is devoid of evidence to support a finding of disability based on back pain. Plaintiff did not seek consistent treatment for back pain during the relevant time period. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). Although a late 2005 examination revealed a limited range of motion in plaintiff's back, he was prescribed only Tylenol. In early 2006, plaintiff had no range of motion limitations, muscle spasm, muscle atrophy, or gait/coordination issues. He could hold a pen and write, touch fingertips to palm, grip 100%, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk on heel and toes, and squat and arise from a squatting position. It was not until this general physical examination ordered by the Administration that plaintiff underwent x-rays of his lumbar spine. At this time, the results showed only mild osteoarthritis of the lumbar spine with scalloping of the end plate at L5 and facet joint arthritis at the L5-S1 level. However, Dr. Abraham concluded that plaintiff had no limitations. X-rays of his right ankle were also normal. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). The undersigned finds it very difficult to

believe that an individual in the degree of pain plaintiff reported experiencing would not seek out consistent medical assistance either through a local clinic or an emergency room.

Plaintiff seeks to excuse his failure to seek consistent treatment for financial reasons, stating that he did not have the resources to obtain treatment.  However, there is no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking cigarettes to help finance his treatment.  *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir. 1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).  In fact, the record indicates that plaintiff was referred to a prescription drug assistance program on at least one occasion, but there is nothing to indicate he followed-up with that organization.  As such, we can not say that this failure to seek consistent treatment is excused by his financial situation.

We also note that the treatment plaintiff did receive for his back was conservative in nature.  *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).  In fact, the record is devoid of any evidence to suggest that plaintiff was given a regular prescription for any prescription pain medication during the relevant time period.  *See Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir.1993) (pain which can be remedied or controlled with over-the-counter analgesics normally will not support a finding of disability).  As stated above, at one point, plaintiff was told to take Tylenol.  Clearly, this does not support a finding of severe pain.

13

In addition to his alleged back pain, the record indicates that plaintiff was diagnosed with COPD in 1999.  However, we can find no evidence in the record to show that he was treated for this condition during the relevant time period.  *See Edwards v. Barnhart*, 314 F.3d at 967.  In fact, plaintiff was taking no medication to control this impairment.  Plaintiff criticizes the ALJ for finding his COPD to be mild and non-severe.  While the record does reveal a 1999 x-ray showing significant COPD, pulmonary function tests ("PFT's") conducted about the same time, showed very mild COPD.  (Tr. 248, 249).  Another chest x-ray conducted in 2002, revealed only the presence of COPD.  (Tr. 278).

We note that PFT's evaluate how well the lungs work.  They show how much air the lungs can hold, how quickly they can move air in an out of the lungs, and how well the lungs put oxygen into and remove carbon dioxide from the blood.  *See* James Obrien, Jr., *Tests of Pulmonary Function*, *at* www.merck.com.  As such, we agree with the ALJ and find the PFT results to be a more reliable source for determining the severity of plaintiff's lung problems.  It seems clear to the undersigned that plaintiff's lung impairment was very mild and did  not significantly limit the claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a).

In addition, plaintiff was treated for ulcers and an H. Pylori infection in 2005.  He was prescribed Nexium and Prevpac.  Aside from his self reported history ulcers and hiatal hernia, there is no other medical evidence to indicate that plaintiff experienced difficulty with these impairments during the relevant time period, or that they would prevent him from performing

14

work-related activities.  *See Edwards v. Barnhart*, 314 F.3d at 967.  Therefore, we can not say that these impairments were disabling.

Aside from the mental evaluations ordered by the Agency and scheduled by plaintiff's attorney, there is also no evidence to indicate that plaintiff's mental impairments were disabling. *See Moad v. Massanari*, 260 F.3d 887, 892 (8th Cir. 2001) (in assessing credibility, the court noted that plaintiff had not sought treatment from any physician in the seven months prior to administrative hearing).  Plaintiff was not prescribed medication to be taken regularly and did not seek inpatient or outpatient treatment for his condition during the relevant time period. While we note Dr. Smith's assessment concluding that plaintiff suffered from cognitive dysfunction and was unable to work, we also note that this assessment is not supported by the overall record. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence).  Dr. Brazas's assessment, conducted two months later, did not reveal any limitations associated with cognitive dysfunction.  In fact, plaintiff had to be probed by Dr. Brazas to even talk about his psychological impairments.  He then listed his impairments as difficulty sleeping, a history of anger problems, forgetfulness, premonition, depression, and stress.  While it is clear to the undersigned that plaintiff suffered from some limitations associated with his mental impairments, we can not say that these impairments were disabling during the relevant time period.

Plaintiff's reported activities also contradict his claim of disability.  In December 2005, plaintiff completed an adult function report indicating that his daily activities included praying, reading the bible, and sometimes performing light housework. (Tr. 76).  He also reported the

15

ability to care for his dogs and cat, prepare microwave foods, do his laundry, sometimes wash dishes, mow the yard (takes four hours), walk, drive a car, ride in a car, shop for groceries and clothing in stores, count change, handle a savings account, use a checkbook/money orders, read, study the bible, watch television, listen to Christian music, talk to others, and "do some charity work." (Tr. 76-80). Plaintiff indicated that he studied his bible approximately two hours per day and also read other books two to three hours per day. (Tr. 80). Further, he stated that he could sometimes follow written instructions well, could follow oral instructions if he understood what he was being asked to do, did not get along very well with authority figures, and had been fired or laid off for "getting into it with the boss." (Tr. 81-82).

On paperwork plaintiff prepared for his attorney, plaintiff indicated that he sat down six hours per day; could stand and walk about nine to ten hours; could sometimes drive, make the bed, water the yard, sometimes handle finances, and read his bible daily; sometimes cook, dust, vacuum, mop the floor, and wash one to two loads of laundry per week; and, sometimes wash dishes, clean the house and go out to eat or to a movie monthly. (Tr. 127-128). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Clearly, plaintiff was capable of performing some work-related activities.

16

Plaintiff's friend, Quinton Breakbill, also testified on his behalf.  (Tr. 368-372).

Testimony indicates that Mr. Breakbill had known the plaintiff for approximately twelve years.

He had reportedly taken plaintiff in when he did not have a place to live or food to eat.  (Tr. 368-369).  He believed plaintiff to be depressed based on plaintiff's desire not to be disturbed by others and statements that he was not good for anything or anyone.  Mr. Breakbill also testified that plaintiff was forgetful, required reminders, was ill quite often, experienced days when he "couldn't even hardly talk," and sometimes experienced difficulty walking up the stairs to his room.  The ALJ properly considered Mr. Breakbill's testimony, but found it to be unpersuasive, as it is not supported by the overall record.  This determination was well within the ALJ's province.  *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, we find that the ALJ properly determined that plaintiff's daily activities were inconsistent with his subjective complaints of disabling impairment.  His subjective complaints were also inconsistent with the medical evidence.

## B.      The ALJ's RFC Assessment

RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored

17

into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the

Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."

*Lauer v. Apfel,*  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination

concerning a claimant's RFC must be supported by medical evidence that addresses the

claimant's ability to function in the workplace."  *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir.

2003).

The ALJ considered the medical records in evidence, the RFC assessments completed

by examining and non-examining consultants, and plaintiff's subjective complaints before

determining his RFC.  We can find no evidence to support the plaintiff's assertion that the ALJ

disregarded the medical evidence.

On February 9, 2006, Dr. Alice Davidson reviewed plaintiff's medical records and

completed a physical RFC assessment.  (Tr. 191-198).  She concluded that plaintiff could

perform medium level work involving occasional stooping and crouching.  No other limitations

were noted.  (Tr. 191-198).

On March 31, 2006, Dr. Kathryn Gale completed a psychiatric review technique form and

a mental RFC assessment.  (Tr. 171-188).  After reviewing plaintiff's medical records, she

diagnosed plaintiff with neuropsychological testing suggestive of cognitive disorder, dysthymia,

and personality disorder not otherwise specified.[1]  Dr. Gale concluded that plaintiff had mild

restriction of activities of daily living and moderate difficulties in social functioning and

---

[1] Plaintiff contends that the ALJ improperly stated that Dr. Gale had concluded that a "diagnosis of cognitive dysfunction was only suggested by the independent neuropsychologist."  However, we find no error in this statement.  The ALJ was merely emphasizing that Dr. Gale did not diagnose plaintiff with cognitive dysfuction.  Instead she noted that cognitive dysfunction was suggested by a neuropsychological evaluation.

18

maintaining concentration, persistence, or pace.  She also found that plaintiff would be moderately limited with regard to understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and, interacting appropriately with the general public.  No episodes of decompensation were noted.  (Tr. 171-188).

As previously noted, the records indicate that plaintiff was treated for back pain, a kidney passed stone, GERD, a hiatal hernia, and ulcers during the relevant time period.  However, he did not seek consistent treatment for these conditions and was not prescribed medication with any regularity.  We also note that there is no evidence to suggest that any of the doctors examining plaintiff during the relevant time period placed any restrictions on his activity level or concluded that he was disabled.  *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's treating physicians opined the claimant was so impaired or disabled that the claimant could not work at any job).  Dr. Abraham examined plaintiff during the relevant time period and found him to have no range of motion limitations, muscle atrophy, or muscle spasms.  In fact, although outside the relevant time period, in 1993, plaintiff's treating doctor noted that plaintiff might be malingering in order to obtain disability.

Plaintiff also contends that the ALJ failed to properly consider the findings of Joseph Long, a chiropractor who treated plaintiff from May 2006 until October 2007.  (Tr. 282-310). We note, however, that these records are dated outside the relevant time period.  Plaintiff was found to be disabled as of March 1, 2006.  We can find no evidence to show that plaintiff's

19

physical impairments were disabling prior to this time.  As previously noted, plaintiff did not seek consistent treatment for his physical impairments during the relevant time period. Therefore, we can not say that Dr. Long's assessment bears any relation to plaintiff's condition during the relevant time period.

In his brief, plaintiff also alleges that the ALJ overlooked the findings of Dr. Safwan Sakr, a rheumatologist, who found diagnosed plaintiff with fibromyalgia.  While we have reviewed Dr. Sakr's findings, we note that he treated plaintiff on October 19, 2007.  Because his assessment was performed outside the relevant time period and there is no evidence to indicate that plaintiff was suffering from fibromyalgia during the relevant time period, the ALJ was not required to give Dr. Sakr's opinion controlling weight.  It appears, however, that Dr. Sakr's opinion was considered when the Administration determined that plaintiff was disabled as of March 1, 2006.

Further, plaintiff criticizes the ALJ for commenting on Dr. Smith's failure to consider the possible impact of alcohol or drug abuse on the tests he administered or the possibility of malingering for secondary gain.  While there is no evidence to show that plaintiff was using alcohol or drugs at the time of Dr. Smith's evaluation, there is also no evidence to show he was not.  Plaintiff admitted drinking in the past and using pot, speed, and LSD.  Given plaintiff's lack of mental health treatment and his history of drug and alcohol use, we do not find it was error for the ALJ to mention Dr. Smith's failure to consider these possibilities.  Doing so does not place the ALJ into the province of a doctor.  Dr. Smith's failure to consider these possibilities is also not the main reason his opinion was afforded little weight.

20

It is clear that Dr. Smith's assessment was influenced by the information plaintiff provided him, including reports of some falls, fights, and accidents resulting in traumatic brain injuries and his reports of chronic pain. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (opinion of consulting physician is not entitled to special deference, especially when it is based largely on claimant's subjective complaints). Again, we can find no evidence in the record to support plaintiff's contention of disabling pain. We have only his subjective complaints of pain. Likewise, the remaining medical evidence makes no mention of traumatic brain injuries. Therefore, while we are cognizant of the value of neurocognitive testing in disability cases, we do not find that the overall medical evidence supports the level of impairment Dr. Smith contends plaintiff's test results indicated.

We have also reviewed the literature plaintiff attached to his brief concerning association between chronic pain and brain atrophy. However, after reviewing the evidence of record, we find no evidence to indicate that this is the case for plaintiff. As previously mentioned, the record simply does not bear out that plaintiff suffered from disabling chronic pain during the relevant time period. Further, there are no MRI's or CT scans of plaintiff's brain to show any atrophy due to chronic pain. As such, we do not find plaintiff's argument to be persuasive.

Thus, given plaintiff's failure to seek consistent treatment for his physical or mental impairments during the relevant time period, we find that the ALJ's RFC assessment is supported my substantial evidence. Plaintiff was capable of performing light work involving only occasional stooping and crouching; interpersonal contact that is incidental to the work performed, the complexity of the tasks is learned and performed by rote, requires little judgment; and, requires only simple, direct, and concrete supervision.

AO72A
(Rev. 8/82)

### D.        Vocational Expert's Testimony

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

In the present case, the ALJ asked the vocational expert whether a person of plaintiff's age, education, and past experience, who could perform light work with occasional stooping and crouching; frequent climbing balancing, kneeling, and crawling; and,  is limited to performing work where the interpersonal contact is incidental to the work performed; the complexity of the tasks are learned and performed by rote with few variables; and, the judgment required is simple, direct, and concrete, could perform work that exists in significant numbers in the national economy.  (Tr. 372-378).  The expert indicated that such a person could perform work as a production worker.  (Tr. 373, 377).  Clearly, the hypothetical posed to the expert encompasses all of the impairments that the ALJ found were substantially supported by the record as a whole. Therefore, we find the vocational expert's testimony to constitute substantial evidence.

### V.        <u>Conclusion</u>

Accordingly, having carefully reviewed the record, the undersigned finds substantial

evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 23rd day of March 2010.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)